## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GENE R. SCHNEIDER,<br>    Plaintiff,<br>    v.<br>CAROLYN W. COLVIN, ACTING<br>COMMISSIONER SOCIAL SECURITY<br>ADMINISTRATION,<br>    Defendant. | No. 3:13-cv-00790 (MPS) |

### MEMORANDUM OF DECISION

### Introduction

Plaintiff Gene R. Schneider brings this action under 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act ("SSA"). Before me are Mr. Schneider's Motion for Order Reversing the Decision of the Commissioner [doc. #18] and the Commissioner's Motion for an Order Affirming that decision [doc. # 21]. In deciding these motions, I considered Mr. Schneider's reply memorandum and therefore GRANT his Motion for Leave to Submit Memorandum in Reply [doc. # 23].

While the Administrative Law Judge ("ALJ") agreed that Mr. Schneider suffers from severe physical impairments arising from his back and hip pain, there is substantial evidence in the record to support the Commissioner's determination that Mr. Schneider's claimed impairments are not so limiting as to warrant a finding that Mr. Schneider is disabled as defined in the SSA. It is for the Commissioner – here, the ALJ – and not for me to make credibility determinations, and I find that those determinations – as well as the Commissioner's other determinations – have been adequately explained and are supported by substantial evidence in the record. For these reasons and those detailed below, I GRANT the Commissioner's Motion

1

for an Order Affirming the Decision of the Commissioner and DENY Mr. Schneider's Motion for Judgment on the Pleadings.

## Procedural History

On December 29, 2010, Mr. Schneider applied for SSI and DIB, alleging disability beginning March 17, 2008.[1]  This application was denied initially on February 16, 2011, and upon reconsideration on April 21, 2011.  Mr. Schneider requested a hearing, and testified at a hearing held on March 21, 2012, before ALJ Ryan A. Alger.  Mr. Schneider was represented by counsel during the hearing.

On May 4, 2012, the ALJ issued his decision that Mr. Schneider had not been disabled as defined in the SSA since March 17, 2008.  Applying the five-step sequential evaluation process prescribed by 20 C.F.R. § 416.920(a),[2] the ALJ first found that Mr. Schneider was not engaged in substantial gainful activity.  (R. at 15.)  At Step Two, the ALJ found that Mr. Schneider's degenerative disc disease and hip pain qualified as severe impairments.  (R. at 15.)  *See* 20 C.F.R. § 416.920(c).  The ALJ also found that Mr. Schneider suffered from medically

---

[1] Mr. Schneider filed an earlier application for SSI and DIB on December 3, 2009.  His application was denied at the initial level of review on February 19, 2010, and there is no indication that it was appealed further.

[2] The regulations promulgated by the Commissioner establish a five-step analysis for evaluating disability claims.  *Bowen v. Yuckert*, 482 U.S. 137, 140–142 (1987); 20 C.F.R. §§ 404.1520, 416.920.  First, the Commissioner considers if the claimant is presently working in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  If not, the Commissioner next considers if the claimant has a medically severe impairment.  § 416.920(a)(4)(ii).  If the severity requirement is met, the third inquiry is whether the impairment is listed in Appendix 1 of the regulations or is equal to a listed impairment.  Section 416. 920(a)(4)(iii); Pt. 404, Subpt. P.App. 1.  If so, the disability claim is granted.  If not, the fourth inquiry is to determine whether, despite the severe impairment, the claimant's residual functional capacity allows him or her to perform any past work.  Section 416.920(a)(4)(iv).  If a claimant demonstrates that no past work can be performed, it then becomes incumbent upon the Commissioner to come forward with evidence that substantial gainful alternative employment exists that the claimant has the residual functional capacity to perform.  Section 416.920(a)(4)(v).  If the Commissioner fails to come forward with such evidence, the claimant is entitled to disability benefits.  *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

documented, yet non-severe, mental impairments. (R. at 15.) *See* 20 C.F.R. § 416.921. At Step Three, the ALJ found that Mr. Schneider's impairments did not meet or equal one of the impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (R. at 15-16.) *See* 20 C.F.R. §§ 416.920(d), 416.925, 416.926.

Proceeding to Step Four, the ALJ found that Mr. Schneider had the residual functional capacity ("RFC") to perform the full range light work,[3] with apparently no nonexertional limitations.[4] (R. at 16-19.) In making this finding, the ALJ considered Mr. Schneider's symptoms according to the two-step process in 20 C.F.R. § 404.1529, which requires the ALJ to first "determine whether medical signs or laboratory findings show any impairment [that] could reasonably be expected to produce the pain or other symptoms alleged" and next determine "the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work," *Joyner v. Comm'r of Soc. Sec.*, No. 5-cv-675, 2009 WL 5214949, at *3 (N.D.N.Y. Dec. 28, 2009), and found that:

---

[3] "When the limitations and restrictions imposed by [the claimant's] impairment(s) and related symptoms, such as pain, affect only [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), [the Social Security Administration] consider[s] that [the claimant] ha[s] only exertional limitations." 20 C.F.R. §§ 404.1569a(b), 416.920a(b). The agency "classifies jobs as sedentary, light, medium, heavy, and very heavy. These terms have the same meaning as they have in the Dictionary of Occupational Titles, published by the Department of Labor." *Id.* §§ 404.1567, 416.967. For example, sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* If a claimant qualifies for a certain exertional level, then the claimant qualifies for all lower exertional levels. *Id.*

[4] Limitations and restrictions that prevent the claimant from meeting job requirements *other* than strength demands are considered nonexertional. 20 C.F.R. §§ 404.1569a(c), 416.920a(c). Examples include difficulty maintaining attention, understanding or remembering detailed instructions, and tolerating physical features of certain work settings (such as dust or fumes). *Id.*

> Because of the inconsistency between the claimant's activities and his allegations regarding the functional limitations of his impairment, the undersigned does not find the claimant's testimony regarding the degree of limitation imposed by his impairments to be fully credible. . . . The objective medical evidence of record supports the residual functional capacity [of the full range of light work]. There is no indication in the medical evidence of record that would further restrict or limit the claimant from performing work-related activities.

(R. at 16, 19.) The ALJ further found that Mr. Schneider could not perform any past relevant work. (R. at 19.)

Therefore, the ALJ proceeded to Step Five, where he reviewed Mr. Schneider's vocational profile, consisting of his RFC, age, education, and work experience, to determine whether Mr. Schneider was able to do any other work that exists in significant numbers in the national economy. (R. at 14, 19-20.) Applying the Medical Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2 the ALJ found that because Mr. Schneider had the RFC for the full range of light work and was a "younger individual" on the alleged onset date of disability, Medical-Vocational Rule 202.18 directed a finding of "not disabled." (R. at 20.) *See* 20 C.F.R. § 404.1569 ("[I]f the findings of fact made about all factors are the same as the rule, we use that rule to decide whether a person is disabled.").

On May 21, 2012, Mr. Schneider filed a timely request for a review of the ALJ's decision with the Social Security Appeals Council ("Appeals Council"). The Appeals Council denied Mr. Schneider's request for review on April 18, 2013, making the ALJ's decision the final decision of the Commissioner. This action followed.

## Analysis

Mr. Schneider presents three sets of arguments in his appeal: (1) the ALJ failed to follow the "slight abnormality" standard when assessing his mental deficiencies (Pl. Mem. at 13); (2) the ALJ failed to assess properly his RFC (*id*. at 14); and (3) the ALJ committed a number of

serious factual errors in his evaluation of the evidence (*id*. at 16).

I.    **Standard of Review**

District courts perform an appellate function when reviewing a final decision of the Commissioner under 42 U.S.C. § 405(g). *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). A reviewing court will uphold an ALJ's decision unless it is based upon legal error or is not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "'Substantial evidence' is less than a preponderance, but 'more than a mere scintilla' and as much as 'a reasonable mind might accept as adequate to support a conclusion.'" *Crossman v. Astrue*, 783 F.Supp.2d 300, 303 (D. Conn. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In determining whether the evidence is substantial, a district court must "take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also New York v. Sec'y of Health & Human Servs.*, 903 F.2d 122, 126 (2d Cir. 1990) (stating that the court is required to "review the record as a whole" in assessing whether the evidence supports the Commissioner's position) (citations omitted). Still, the ALJ need not "reconcile every conflicting shred of medical testimony." *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981). In sum, "the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision." *Morris v. Barnhardt*, No. 2-cv-377, 2002 WL 1733804, at *4 (S.D.N.Y. July 26, 2002).

Courts cannot supply a new or different rationale for an administrative agency's decision. *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943). This does not, however, bar a court from citing additional evidence in the record in support of an existing rationale. Indeed, "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1051 (2d Cir. 1985).

## II.     Discussion of Mr. Schneider's Arguments

### A.   The ALJ failed to follow the "slight abnormality" standard when assessing Mr. Schneider's mental status

There is no evidence in the record that Mr. Schneider sought any mental health treatment until five months before his administrative hearing, and the evidence reflecting Mr. Schneider's mental health visits was addressed by the ALJ.  (*See* R. at 18, 350.)  Based on this evidence, the ALJ held that Mr. Schneider's "anxiety and affective disorders do not cause more than minimal limitation in [his] ability to perform basic mental work activities and is therefore nonsevere. . . ." (R. at 15.)  SSR 96-3p provides guidance for determining the severity of an impairment:

> [A]n impairment or combination of impairments is considered "severe" if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a *slight abnormality* (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities. . . . Symptoms, such as . . . nervousness, will not be found to affect an individual's ability to do basic work activities unless the individual first establishes by objective medical evidence . . . that he or she has a medically determinable . . . mental impairment(s) and that the impairment(s) could reasonably be expected to produce the alleged symptom(s).

(emphasis added).  To assess the severity of a mental disorder, the functional limitations imposed by the disorder are considered across four different categories: (1) activities of daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) episodes of decompensation. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 12.00C.  These four categories are also known as "paragraph B" criteria.  (R. at 15.)  The ALJ determined that Mr. Schneider has only mild restrictions in the first three categories, and no episodes of decompensation "which have been of extended duration," and that therefore any claimed mental impairment was nonsevere.  (R. at 15.)

Mr. Schneider argues that "[i]n drawing his conclusions that [Mr. Schneider's] anxiety and affective disorders are not severe, the ALJ makes no reference to the medical record and almost completely ignores Exhibit 13F" and that the treatment notes from Exhibit 13F "are virtually ignored by the ALJ." (Pl. Mem. at 13.)  On the contrary, the ALJ's determination of the severity of Mr. Schneider's mental status was made "[a]fter a thorough review of the record," which included attention to Exhibit 13F.  (R. at 15.)  In the RFC assessment, the ALJ specifically referenced Exhibit 13F, which is comprised of four documents from the Charlotte Hungerford Hospital: (1) Initial Psychiatric Evaluation, (2) Individualized Treatment and Recovery Plan, (3) Psychopharmacology Progress Note without Medication Box, and (4) Individualized Treatment and Recovery Review/Revision Adult.  (R. at 18, 347-59.)   The ALJ noted that "[m]ental status examination upon initial intake was within normal limits."  (R. at 18.)  A review of the Initial Psychiatric Evaluation shows that Mr. Schneider was within normal limits for his eye contact, posture, facial expression, orientation, psychomotoric activity, speech, perception, thought content, thought process, intellectual functioning, memory, and insight.  (R. at 352-53.)  His judgment was rated as fair and his intelligence as average.  (R. at 352.)  Although Mr. Schneider presented as physically unkempt and restless, this does not detract from the fact that in the overwhelming majority of categories he presented as within normal limits.  (R. at 352-53.)

The ALJ next observed that "[c]linicians diagnosed the claimant with a mood disorder not otherwise specified and estimated the claimant's Global Assessment of Functioning (GAF) score at 51, indicating moderate symptoms."  (R. at 18.)  Pointing to GAF scores of 42, 51, 52, and 55 that were attributed to him over time, Mr. Schneider argues that the ALJ relies only on those scores that support his conclusion.  (Pl. Mem. at 14.)  These GAF scores were given on October 19, 2011, November 16, 2011, January 17, 2012, and January 26, 2012, respectively.

(*See* R. at 347-59.)  The Second Circuit explains that:

> GAF is a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 376–77 (4th ed., text revision, 2000) ("DSM–IV–TR").  The GAF scale ranges from 0 to 100[.] . . . GAF scores between 51–60 indicate that the individual has moderate symptoms or moderate difficulty in social, occupational, or school situations.

*Petrie v. Astrue*, 412 F. App'x 401, 406 n.2 (2d Cir. 2011).  The GAF score of 42 is therefore the only score that could possibly have a deleterious impact on the ALJ's decision.  (*See* R. at 347.)

The ALJ's failure to consider the GAF score of 42 was not an error because the majority of Mr. Schneider's GAF scores were above 50 and, as noted by the ALJ, "[t]he claimant started psychiatric medication with significant improvement in mood."  (R. at 18.)  Such progress and improvement is relevant because a GAF score is merely a "snapshot opinion of one or more doctors as to an individual's level of social, psychological and occupational function at a specific point in time[,]" whereas "[a] determination of disability must be based on the entire record." *Malloy v. Astrue*, No. 10-cv-190, 2010 WL 7865083, at *26 (D. Conn. Nov. 17, 2010).

Even prior to the release of the DSM-V in 2013, courts have held that an ALJ's failure to consider every GAF score is not a reversible error.  *See Carrigan v. Astrue*, No. 10-cv-303, 2011 WL 4372651, at *6 (D. Vt. Aug. 26, 2011) ("[Plaintiff] claims that the ALJ's failure to discuss the GAF scores of 50 or below was error, but, as this Court has stated before, GAF scores – in and of themselves – do not demonstrate that an impairment significantly interferes with a claimant's ability to work."), *report and recommendation adopted*, No 10-cv-303, 2011 WL 4372494 (D. Vt. Sept. 19, 2011); *Parker v. Comm'r of Soc. Sec. Admin.*, No. 10-cv-195, 2011 WL 1838981, at *5 (D. Vt. May 13, 2011) ("[A]n ALJ's failure to reference a GAF score is not, standing alone, sufficient ground to reverse a disability determination.") (*citing Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)); *Zabala v. Astrue*, No. 5-cv-4483, 2008

WL 136356, at *4 (S.D.N.Y. Jan. 14, 2008) (internal quotation marks and citations omitted) ("[T]he ALJ is not required to reconcile explicitly every conflicting shred of medical testimony. Nor is the ALJ required to mention or discuss every single piece of evidence in the record. Here, while the ALJ did not specifically discuss [Plaintiff's] low GAF score, the ALJ did expressly discuss the clinical notes that accompanied the score. Moreover, this GAF score was assessed when [Plaintiff] had forgone all mental health treatment for more than one year, and was followed eight days later by a GAF score of fifty-five, which is indicative of only moderate symptoms."), *aff'd*, 595 F.3d 402 (2d Cir. 2010).[5]

Finally, the ALJ states that "[t]reatment notes from January 2012, report diagnoses of bipolar disorder and generalized anxiety disorder as well as cocaine dependence in full remission and alcohol dependence in partial remission, but good results with medication and therapy." (R. at 18.) Mr. Schneider states, in a conclusory fashion, that: "Clearly, the ALJ's finding that the Plaintiff's anxiety and mood disorder is not a severe impairment is not based on such evidence as a reasonable mind might accept as adequate to support the conclusion that the Plaintiff's anxiety and mood disorder are not severe. The fact is the ALJ cites no evidence to support such a conclusion and ignores the evidence that tends to refute it." (Pl. Mem. at 14.) Mr. Schneider, however, has not pointed to any objective evidence that his bipolar and anxiety diagnoses limited

---

[5] Since the issuance of the DSM-V, courts have become even more reluctant to find any error in the failure to consider a plaintiff's GAF scores. *See Mainella v. Colvin*, No. 13-cv-2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) ("[T]he most recent edition of the [DSM] . . . has dropped the use of the [GAF] scale. The Social Security Administration issued a bulletin dated July 31, 2013, limiting use of GAF scores. At a basic level, the Administration noted that '[t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation.' . . . There are other problems: the GAF score is not designed to predict outcomes, and the scores are so general that they are not useful without additional supporting description and detail. . . . Generally, the guidance instructs ALJs to treat GAF scores as opinion evidence; the details of the clinician's description, rather than a numerical range, should be used.").

his ability to work or inhibited his activities of daily living, social functioning, or concentration, persistence, or pace.[6]  *See Britt v. Astrue*, 486 F. App'x 161, 163 (2d Cir. 2012) ("[Plaintiff's] argument is without merit because he did not furnish the ALJ with any medical evidence showing how these alleged impairments limited his ability to work.")

"With respect to [a] bipolar diagnosis, . . . the mere diagnosis of an ailment on a particular date is not sufficient to prove disability, as an objective diagnosis says nothing about the severity of the condition.  The same rule holds true with respect to isolated events such as anxiety attacks and manic episodes."  *Parker*, 2011 WL 1838981, at *5.  As discussed above, the record shows that Mr. Schneider's GAF score steadily improved.  After seeking treatment, Mr. Schneider's mood improved and he felt more stable and less anxious.  (R. at 355, 357.) Clinicians reported that Mr. Schneider "has engaged well w[ith] treatment team, attends consistently and takes medication as prescribed."  (R. at 357.)  In addition, his psychomotor was "consistently calmer," his sleeping had improved, and he was "no longer having racing thoughts or hearing voices."  (*Id*.)  These facts provide substantial evidence for the ALJ's conclusion that Plaintiff's mental impairments were non-severe.

Even if the ALJ had committed an error and Mr. Schneider's mental impairment should have been deemed severe, such an error would be harmless because the ALJ continued to consider Mr. Schneider's mental limitations when making the RFC assessment.  (R. at 15 ("[T]he following [RFC] assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis.").); *see also Reices-Colon v. Astrue*, 523 F. App'x

---

[6] Dr. Stacy Taylor's Mental RFC Assessment of Mr. Schneider, which is discussed in further detail in Section II.C.1., is opinion evidence that does not constitute objective medical evidence. *See, e.g., Cornell v. Astrue*, 764 F. Supp. 2d 381, 390 (N.D.N.Y. 2010) (physician's physical RFC assessment "cited no objective findings in support of her opinions"); *Pardee v. Astrue*, 631 F. Supp. 2d 200, 209 (N.D.N.Y. 2009) (treating physician's RFC assessment was an opinion).

796, 798 (2d Cir. 2013) (any error resulting from failure to consider anxiety and panic disorders at Step Two was harmless because the ALJ "specifically considered her anxiety and panic attacks" in subsequent steps); *McKiver v. Barnhart*, No. 4-cv-1080, 2005 WL 2297383, at *11-12 (D. Conn. Sept. 16, 2005) (harmless error because "even though the ALJ found that [Plaintiff's] mental impairments were not severe, it is clear that he did not ignore them in addressing subsequent issues in the sequential evaluation process").  In his discussion of Mr. Schneider's RFC, the ALJ dedicated a full paragraph to Mr. Schneider's mental status, citing medical evidence that he reasonably concluded was consistent with his RFC finding.  (R. at 18.)

### B.   The ALJ failed to comply with SSR 96-8p in assessing Mr. Schneider's RFC

The ALJ determined that Mr. Schneider has the RFC to perform a full range of light work.  (R. at 16.)  Mr. Schneider does not advocate for a different RFC level (such as sedentary), or point to any evidence that would contradict the ALJ's assessment.  Instead, Mr. Schneider disputes the ALJ's assessment of his RFC because the assessment "is simply conclusory and does not contain any rationale or reference to the supporting evidence" and "failed to include the required 'function by function' assessment" of Plaintiff's functional abilities to sit, stand, walk, lift, carry, push, and pull.  (Pl. Mem. at 15.)   "Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing." *Malloy*, 2010 WL 7865083, at *30; *Burrows v. Barnhart*, No. 3-cv-342, 2007 WL 708627, at *13 (D. Conn. Feb. 20, 2007) (same).  "While the plaintiff is correct that the ALJ must consider all of the factors listed in 20 C.F.R. § 404.1545 in making his determination of [RFC], the ALJ need not discuss each factor in his written opinion."  *Burrows*, 2007 WL 708627, at *13.

Here, the ALJ relied on evidence in the record in determining Plaintiff's ability to engage in light work.  The ALJ described in detail Mr. Schneider's ability to lift, walk, stand, and sit and

specifically relied upon treatment records from the Community Health and Wellness Center and UCONN Health Center Orthopedics, and Mr. Schneider's Function Report of his activities of daily living.  (R. at 17-18.)  The ALJ also afforded some weight to the opinions of state agency medical consultants Stephen Heller, MD and Anita Bennett, MD.  (R. at 19.)  The ALJ's lengthy discussion of Mr. Schneider's RFC, which spans several pages, is hardly conclusory, and includes some function-by-function discussion of Mr. Schneider's limitations.  (*See* R. at 16-19.)

### C.   The ALJ committed serious factual errors in his evaluation of the evidence

Mr. Schneider provides a laundry list of factual errors that he believes were committed by the ALJ.  (Pl. Mem. at 16-20.)   As indicated by the Commissioner, Mr. Schneider has not demonstrated how any of these alleged errors prejudiced his case.  *See Lena v. Astrue*, No. 10-cv-893, 2012 WL 171305, at *9 (D. Conn. Jan. 20, 2012) ("Absent any showing of prejudice, the ALJ did not fail to meet his burden of developing the record and did not rely on incompetent evidence in deciding this case. *See McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (interpreting *Shinseki v. Sanders*, 129 S.Ct. 1696 (2009), to require the party claiming error to demonstrate prejudice unless the reviewing court concludes that the question of prejudice is borderline, requiring further administrative review).").

### 1.   Failure to consider Dr. Taylor's Mental RFC Assessment

Mr. Schneider argues that the ALJ's assessment of his mental impairments did not properly account for the opinion of his treating physician, Stacy Taylor, MD.  (Pl. Mem. at 17-18.)[7]  In the Mental RFC Assessment portion of a July 21, 2011 "Medical Report (For Medicaid Disability and SAGA Cash Benefits)," Dr. Taylor evaluated Mr. Schneider across twenty mental functions.  (R. at 330-31, 336-37.)  In nineteen of the mental functions, she determined that there

---

[7] Mr. Schneider only disputes the lack of consideration given to Dr. Taylor's mental RFC assessment, and does not mention Dr. Taylor's physical RFC assessment.

was "no evidence of limitation."  (R. at 36-37.)  The only deviation was with respect to Mr. Schneider's ability to "[c]omplete a normal workday/workweek without interruptions from psychologically based symptoms [and] [p]erform at a consistent pace without an unreasonable number of length of rest periods," which she assessed as moderately limited.[8]  (R. at 336.)  This particular mental assessment was not discussed by the ALJ.

Although Mr. Schneider's argument is fashioned as one based on a factual error, he appears to make the legal argument that deference should have been given to Dr. Taylor because she was Mr. Schneider's treating physician.  While the ultimate determination of whether a claimant is disabled is reserved to the Social Security Commissioner, 20 C.F.R. § 416.927(d), courts generally give treating physicians' opinions controlling weight as long as they are well-supported by medically acceptable clinical and laboratory diagnostic techniques.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  When a physician has treated a patient for only a limited period of time, however, that physician is not accorded "treating physician" status. *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight . . . . This was not the case with Dr. Sauvigne, who only examined [Plaintiff] once or twice.  Since he had not seen [Plaintiff] regularly, he had not developed a physician/patient relationship with him, and his opinion is not entitled to the extra weight of that of a 'treating physician.'"); *see also Petrie*, 412 F. App'x at 405 (refusing to give controlling weight to one doctor who had only seen plaintiff once and another doctor who "had only four treatment notes bearing his signature, two of which were merely co-signatures on reports by other providers" and "completed his medical opinion over a year after he had last personally seen [Plaintiff]"); *Aden v. Barnhart*, No. 1-cv-5179, 2003 WL 1090324, at *8

---

[8] It appears that Dr. Taylor initially checked off "no evidence of limitation," scratched it out, and then checked off "moderately limited."  (R. at 336.)

(S.D.N.Y. Mar. 6, 2003) (doctor who had seen plaintiff three times over the course of six months deemed a non-treating physician).

Here, Dr. Taylor had only seen Mr. Schneider once (R. at 340-41) before filling out her July 21, 2011 assessment (R. at 331). This fact was noted by the ALJ. (R. at 19.) Because the ALJ was justified in declining to give Dr. Taylor's opinion controlling weight on this basis, the ALJ's failure to discuss her assessment of Mr. Schneider's moderately limited ability to complete a normal workday was harmless error. Dr. Taylor's opinion is inconsistent with all of the objective evidence of Mr. Schneider's mental capabilities, with the exception of the GAF score of 42, which is discussed above. (*See* R. at 18, 347-59.) Because substantial evidence supports the ALJ's finding that Mr. Schneider's mental impairments were non-severe, and that there were no mental limitations that would be inconsistent with the ALJ's RFC assessment of the ability to perform the full range of light work, there is no basis to reverse on this ground.

### 2. *Mischaracterization of Mr. Schneider's severe physical impairment*

Mr. Schneider contends that the ALJ's finding that he suffers severe impairments from degenerative disc disease and hip pain does not encompass fully his physical medical condition, and serves to minimize his impairment. (Pl. Mem. at 16-17.) First, the ALJ's description of Mr. Schneider's impairment as "degenerative disc disease" is supported in the record. (R. at 78 ("Impairment Diagnosis – 7240 – DDD (Disorders of Back – Discogenic and Degenerative), 272 ("Disc disease at multiple levels as described").) The ALJ did not commit a factual error in his description of Mr. Schneider's physical impairment.

Second, Mr. Schneider does not identify any way in which he was prejudiced by any such mischaracterization, such as how his RFC assessment would have changed, had his physical condition been defined more precisely. The ALJ already found that the severe impairments of

degenerative disc disease and hip pain allow Mr. Schenider to perform only the full range of

light work (and not medium or heavy work), and that Mr. Schneider could no longer perform any

of his past relevant work.  (R. at 16, 19.)  Even if a redefined description of Mr. Schneider's

severe impairments would warrant the conclusion that he could only perform the full range of

sedentary work – and Mr. Schneider has pointed to no evidence that that is so – because Mr.

Schneider is at least literate and able to communicate in English (*see* R. at 26, 257), he would

still be considered "not disabled" under the Medical Vocational Guidelines.  *See* 20 C.F.R. Part

404, Subpart P, Appendix 2.

### 3.  *Evidence of spinal stenosis*

"A claimant is automatically entitled to benefits if his or her impairment(s) meets the

criteria set forth in Appendix 1 to Subpart P of Part 404. 20 C.F.R. § 404.1520(d) (2007) (the

"Listings")."  *McKinney v. Astrue*, No. 5-cv-174, 2008 WL 312758, at *4 (N.D.N.Y. Feb. 1,

2008).  Listing 1.04(A) provides as follows:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis,
> spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral
> fracture), resulting in compromise of a nerve root (including the cauda equina) or
> the spinal cord. With:
>  A. Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness or muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of the lower back, positive straight-leg
> raising test (sitting and supine);

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.  "Thus, in order to satisfy this listing, Plaintiff must

establish that (1) []he has a disorder of the spine which compromises a nerve root or the spinal

cord, and (2) that this disorder is manifested by neuro-anatomic distribution of pain, limitation of

motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)

accompanied by sensory or reflex loss *and*, if there is involvement of the lower back, positive

straight-leg raising test (sitting and supine)." *McKinney*, 2008 WL 312758, at *4 (emphasis in original).

The ALJ found that Mr. Schneider did not meet the requirements set forth in Listing 1.04 because "there is no evidence of nerve root compression, spinal arachnoiditis, lumbar spinal stenosis, or ineffective ambulation in the medical record." (R. at 16.) Mr. Schneider argues that he meets all elements of Listing 1.04 because he has stenosis, antalgic gait, and positive straight-leg raising test. (Pl. Mem. at 18.) In support of his argument that he has a disorder that compromises a nerve root or spinal cord, he points to only one piece of evidence – Advanced Practice Registered Nurse ("APRN") Joann Orsatti's December 29, 2009 report that was written after MRI imaging. (R. at 271, 303 (duplicate copy of 271).) While the report states that "some facet disease causes mild bilateral foraminal stenosis" at L2-L3, there was no evidence of root compression. (*Id*.) Similarly, other vertebrae either had no reported spinal or foraminal stenosis, or mild to moderate foraminal stenosis "*without discrete root compression*." (*Id*. (emphasis added).) APRN Orsatti concluded by stating that "[t]he conus and cauda equine are unremarkable." There is no evidence, therefore, that Mr. Schneider has a spinal disorder that meets the definition set forth in Listing 1.04.[9] In his reply memorandum, Mr. Schneider points to APRN Orsatti's statement that "[t]here is multilevel foraminal compromise which should be correlated clinically." (Reply Mem. at 3; R. at 272, 304 (duplicate copy of 272).) There is no basis for assuming that APRN Orsatti's statement about clinical correlation disturbs her conclusion about the lack of root compression.

Mr. Schneider also fails to meet the requirements set forth in Listing 1.04 because he has

_____

[9] Other portions of Mr. Schneider's medical record support APRN Orsatti's conclusion. (R. at 57 (February 16, 2011 Disability Determination: "MER [Medical Evidence of Record] substantiates presence of DDD [degenerative disc disease] w/o spinal stenosis"), 279 (January 5, 2010 medical notes: "Review MRI . . . no spinal stenosis.").)

not pointed to evidence demonstrating sufficient limitation of motion or motor loss.   "The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, *for at least 12 months*."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B(2)(b) (emphasis added).   The ALJ noted that examining physician Joseph Walker, MD had determined that Mr. Schneider had "normal gait and heel-toe walk," and that Mr. Schneider "did not have a cane at the hearing and physical examinations repeatedly report normal gait." (R. at 19.)  Dr. Walker made this statement in April 2011.[10]  (R. at 326-27.)  While Mr. Schneider points to Dr. Walker's July 15, 2011 observation that "[g]ait was antalgic" (R. at 360), he cites to no long-term evidence of antalgic gait that would satisfy the definition set forth in Section 1.00(B)(2)(b).

### 4.  Failure to consider Mr. Schneider's obesity

Mr. Schneider claims that the ALJ minimized the effect of obesity when assessing his RFC.  (Pl. Mem. at 20.)  In his discussion of Mr. Schneider's RFC, the ALJ noted that Mr. Schneider weighed between 208-220 pounds, which equates to a body mass index ("BMI") between 32.6 and 34.5.  (R. at 18.)  The ALJ stated:

> Consideration has been given to the possible effects and impact obesity has on the claimant's ability to perform basic work activities.  The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone.

(*Id*.)  This language shows clearly that the ALJ gave some consideration to Mr. Schneider's obesity when making his RFC assessment.

Mr. Schneider failed to meet his burden of demonstrating "that obesity worsened his

---

[10] January 5, 2010 medical notes reported "able to heel-toe walk."  (R. at 279.)  The February 16, 2011 Disability Determination also reported that Mr. Schneider's MER substantiated presence of "normal gait, intact heel and toe walk."  (R. at 57.)

other impairments or restricted his ability to work." *Francis v. Astrue*, No. 9-cv-1826, 2010 WL 3432839, at \*4 (D. Conn. Aug. 30, 2010); *see also Britt*, 486 F. App'x at 163 ("[Plaintiff] argues that the ALJ erred at step two when he determined that [Plaintiff's] obesity and arthritis were not severe impairments. [Plaintiff's] argument is without merit because he did not furnish the ALJ with any medical evidence showing how these alleged impairments limited his ability to work. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512(a)."). He does not point to any evidence indicating that his obesity qualified as a severe impairment. *See* Titles II & XVI: Evaluation of Obesity, SSR 02-1p (S.S.A Sept. 12, 2002) ("There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment."); *Martin v. Astrue*, 337 F. App'x 87, 89 (2d Cir. 2009) ("Plaintiff urges us to identify error in the ALJ's alleged failure to acknowledge plaintiff's obesity and to recognize it as a 'severe' impairment. We detect no such error. The record demonstrates the ALJ's acknowledgment of plaintiff's obesity . . . . Further, substantial evidence in the record supports the ALJ's determination that [Plaintiff's] obesity is not a 'severe' impairment that 'significantly limits [her] physical or mental ability to do basic work activities.' 20 C.F.R. § 404.1520(c). While numerous medical reports discuss plaintiff's back ailments, they mention plaintiff's obesity only four times and provide no evidence of a severe impairment limiting work ability.").

"ALJs will consider functional limitations resulting from obesity only when they 'identify obesity as a medically determinable impairment.'" *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 277 (N.D.N.Y. 2009) (*quoting* SSR 02-1p). Because Mr. Schneider has failed to point to any evidence in the record that his obesity was considered to be a medically determined impairment, he has not shown that the ALJ erred in declining to assess specifically how Mr. Schneider's RFC was impacted by his obesity.

18

### 5. *Failure to consider Mr. Schneider's occasional use of a cane*

Mr. Schneider takes issue with the ALJ's description of his use of a cane and argues that the ALJ "failed to consider the impact of even occasional use of the cane on the Plaintiff's ability to perform a full range of light work." (Pl. Mem. at 20.) Mr. Schneider testified that he does *not* usually use a cane when he leaves the house because he feels embarrassed to carry it. (R. at 33.) Although the ALJ's description of Mr. Schneider's testimony about the frequency of the use of a cane was, at points, inaccurate, Mr. Schneider does not show how such mischaracterization prejudiced him. If anything, characterizing Mr. Schneider as a more frequent cane user would only serve to aide his disability argument, rather than hinder it. In addition, Mr. Schneider points to no evidence showing how his use of a cane – whether frequent or infrequent – would merit a different impairment finding or RFC assessment.

In any event, the ALJ found that Mr. Schneider's claimed functional limitations, apparently including the need to use a cane, lacked credibility. (*See* R. at 19 ("Despite the claimant's testimony that he usually uses a cane for ambulation, he did not have a cane at the hearing . . . . Because of the inconsistency between the claimant's activities and his allegations regarding the functional limitations of his impairment, the undersigned does not find the claimant's testimony regarding the degree of limitation imposed by his impairments to be fully credible.").) It is the province of the Commissioner, not the reviewing court, to determine the credibility of a claimant. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). "[T]he ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations

19

omitted).  The ALJ uses the following framework to assess a claimant's credibility:

> [T]he adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96-7p.

Citing Mr. Schneider's activities of daily living, where Mr. Schneider reported shopping for food, going for walks, cleaning, and doing laundry (R. at 257-260), and Mr. Schneider's testimony that he could lift ten to fifteen pounds (R. at 30) and walk for fifteen to twenty minutes (R. at 33), the ALJ found that Mr. Schneider lacked credibility "[b]ecause of the inconsistency between the claimant's activities and his allegations regarding the functional limitations of his impairment."  (R. at 17-19.)  The ALJ also found that Mr. Schneider's past history of substance abuse detracted from his credibility.  (R. at 19.); *see Netter v. Astrue*, 272 F. App'x 54, 55 (2d Cir. 2008) ("[Plaintiff] argues that the [ALJ] and the district court erred in discounting his credibility on the basis of a decades-old conviction for armed robbery and his history of substance abuse.  But he cites no controlling legal authority for the proposition that these are impermissible considerations.").   Because substantial evidence exists to support the ALJ's conclusion that Mr. Schneider's testimony should be given "limited weight" (R. at 19), the ALJ committed no error in his evaluation of Mr. Schneider's use of a cane.

### 6.  *Failure to employ the testimony of a Vocational Expert*

Finally, Mr. Schneider argues that the ALJ failed to "determine to what extent, if any, that the medically determinable impairments he did find to be credible would have on the occupational base" because the ALJ decided not to take testimony from a Vocational Expert

("VE").  (Pl. Mem. at 19-20.)  The Second Circuit has determined that an ALJ need not consult a

VE in every case:

> [W]e believe that the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work – over and above any incapacity caused solely from exertional limitations – so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.
>
> . . .
>
> Once a disability claimant proves that his severe impairment prevents him from performing his past work, the Secretary then has the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy.  In the ordinary case the Secretary satisfies his burden by resorting to the applicable medical vocational guidelines (the grids). . . . But if a claimant suffers from additional "nonexertional" impairments, the grid rules may not be controlling.

*Bapp v. Bowen*, 802 F.2d 601, 603-04 (2d Cir. 1986) (citations omitted).

The ALJ did not find that Mr. Schneider suffered from any nonexertional limitations that

diminished his ability to work, and therefore applied the Medical Vocational Guidelines.  (*See* R.

at 20.)  A review of the record supports this conclusion.  (*See* R. at 57 (February 16, 2011

disability determination found no manipulative, visual, communicative, or environmental

limitations), R. at 69 (April 19, 2011 disability determination found same), 352-54 (Mr.

Schneider presented with fair judgment  and "within normal limits" with respect to speech,

perception, thought content, thought process, intellectual functioning, memory, and insight).)

Mr. Schneider has only pointed to his obesity, which, as discussed above, the ALJ considered

when making his RFC assessment and did not find to diminish Mr. Schneider's ability to work

"over and above" the limitations caused by his back and hip impairments.  (*See* R. at 18

("Consideration has been given to the possible effect and impact obesity has on claimant[]. . . . [C]laimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment.").)

Because Mr. Schneider's diminished ability to work arises only from his exertional limitations, the ALJ was permitted to make a disability determination based solely on the Medical Vocational Guidelines.  These guidelines direct that an individual with the ability to do the full range of light work who is the same age as Mr. Schneider is not disabled, regardless of education or previous work experience.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2

<u>**Conclusion**</u>

For the foregoing reasons, I GRANT the Commissioner's Motion for an Order Affirming the Decision of the Commissioner  [doc. # 21] and DENY Mr. Schneider's Motion for Order Reversing the Decision of the Commissioner [doc. # 18].  The Clerk is directed to close this case.

IT IS SO ORDERED.

    /s/
Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              August 29, 2014